Staples, J.
Heitker party claims, that this is a Confederate transaction. Sutherlin treats the certificate as a security for the payment of its nominal amount in lawful money of the United States. The plea of usury is a tacit admission, on the part of the defendant, that this is a proper construction of the contract.
The special verdict does not find that this contract, - according to the understanding of the parties, was to be fulfilled in Confederate notes, or that it was entered into with reference to such notes as a standard of value; nor have the jury found any fact from which this court can infer it. We must therefore consider *579 the certificate as a promise to pay the sum of $5,000 iu legal currency. The question presented for our consideration is, whether this transaction is usurious.
With an anxious desire to arrive at a correct conclusion upon this point, I have carefully considered the arguments, oral and written, which have been made. I have attentively read the authorities to which we have been referred, and the conviction- is forced upon my own mind, that this contract cannot be sustained by the courts. In giving the reasons which have led me to this conclusion, I prefer to present my own views in connection with the argument of the counsel for the appellee.
It is not unworthy of remark, that the counsel do not agree among themselves as to the character of this transaction. By one it is said to be what it professes— a sale of bonds; by another a sale of Confederate notes; by another an exchange of securities; by another admitted to be a loan, but not usurious, because usury •cannot be predicated of a loan of Confederate currency, because the nominal amount of the notes advanced is larger than that of the obligation for their repayment. And thus the transaction, Proteus like, has the distinguishing faculty of assuming whatever form or shape the exigencies of the occasion may require. But the courts must look at the real nature and substance of the contract, and not at the name or title the parties or their counsel may be pleased to-bestow upon it.
As I have just stated, it is insisted that this contract is a sale of corporate bonds, which the common council might make at any discount without trenching upon ■the statute against usury.
There is no doubt, whatever, that the owner of a note has the right to sell it for the most he can get; as he would have the right to sell any goods or wares he -owned. But, on the other hand, it is quite as certain that no one has a right to make his own note and sell *580 that for what he can get; for this, while in appearance the sale of a note, is, in fact, the giving a note for money. It is a lending and a borrowing, and nothing else.
It is said, in Whitworth v. Adams, 5 Rand. 333: “If A, wishing to raise money, were to make his note payable to B, and then go to B and offer to sell it to him; and B, supposing that a man might lawfully sell his own note, were to give the money for it, verily believing-he was purchasing a note, and not lending his money on the security of a note, this would unquestionably he a loan; on the ground that he had intentionally done that which the law makes a loan. And this intention would, if the note' were taken at a high discount, he a corrupt intent sufficient to vacate the contract.”
This principle of law is in conformity with leading adjudicated cases, and is recognized universally by the elementary writers. Parson's Mercantile Law 265; Brummel & Co. v. Enders, Sutton & Co., 18 Gratt. 873; Brockenbrough’s ex’ors v. Spindle, 17 Gratt. 43.
The reason of this rule is obvious. In every sale there must he not only parties, hut a thing to he sold. A man cannot sell his own promise to pay, because such an obligation is'not the subject of sale. So long as it remains in his own possession it is payable to no one, and hinds no one. It is the delivery alone that gives it vitality, and when delivered it then becomes, and not till then, a promise to pay according to the contract. The sale of .the maker’s own note to the party advancing the money for it, is precisely the same as an advance of money upon a promise to secure its repayment by the execution of a note. All'the authorities agree that in either case the transaction is a loan, whatever may he the intent of the parties.
That these principles apply as well to corporations as to individuals, is conceded by all the authorities I *581 have seen. Indeed when corporations effect loans they do so by sales of their bonds or certificates. This is the customary mode recognized in the commercial world, and by the statutes conferring authority to borrow money.
The purchaser of such bonds understands he is lending his money to the corporation. He knows that the offer to sell is but an application for a loan, made to any who have funds to invest upon the faith of such securities. The case of Rogers v. Burlington, 3 Wall. U. S. R. 654, is a direct authority upon this point. The city of Burlington loaned to the Burlington and Missouri Railroad Company $75,000, in its own bonds. A part of these bonds passed into the hands of holders for value, and not being paid, were put in suit. It was insisted the city was not responsible, because the bonds shewed, on their face, they were issued as a loan of the credit of the city, and not for any municipal purpose. The Supreme court, in answering this objection, said, “Technically speaking, it maybe said that the transaction, as between the company and the city of Burlington, was in form a contract of lending; but as between the city of Burlington and the persons who purchased the bonds in the market, it was undeniably a contract of borrowing money. The cases of Mitchell v. Burlington, 4 Wall. U. S. R. 270, 275; Middleton v. Commissioners of Allegheny County, 37 Penn. R. 237, are to the same effect. Bissell v. City of Jeffersonville, 24 How. U. S. R. 289, 290; 34 Penn. R. 511.
I hold then that the “town of Danville” intended to effect a loan; that the advertisement of the sale of the bonds or certificates of the corporation was in law an application for a loan; and the sale subsequently made was the final negotiation and settlement of the terms of that loan, and the certificate given the security provided for its repayment; and further, that Sutherlin, as a matter of law, must be held .to be aware of the *582 nature and legal effect of the contract to which he was a pai’ty. The certificate given him purported, on its face, to he issued in conformity with the act of March ?th, 1862. That act authorized the common council to contract loans and issue certificates for the same; but it gave no authority to purchase depreciated paper, or to exchange its obligations for other securities. If the common council could buy Confederate currency,, could traffic in depreciated paper money, what was to-prevent its acquiring, by purchase or exchange, Confederate or individual bonds; what to restrain it from dealing in land, stocks or merchandize? It can. scarcely be necessary to say that no such power is conferred upon the corporate authorities of the town of' Danville; that the rule applicable to all other corporations applies to them; that is, they exercise such? powers only as are within the terms of the charter.. If the common council of Danville, under the authority “to contract loans,” may sell the corporation bonds or certificates, it is only because such sale-amounts in law to, and is substantially, a loan. It is-, only by considering this transaction a loan that the courts can hold the certificate in question obligatory upon the town of Danville. Once divest it of the features and properties of a loan; ascertain judicially that, it is entirely a different thing, it will he vain to search the charter for a provision under which this transaction can be sustained. When the plaintiff establishes that his contract is not a loan, he also establishes that it was made without authority.
But it is said that the law infers a loan only where-money is advanced upon the discount of the maker’s'own note.; and that Confederate currency was a mere commodity, and not money. I am free to admit, according to the uniform decisions of this court, that money, in a legal sense, is the coin issued or adopted by the sovereign authority, and made a lawful tender *583 in the payment of debts. It must he remembered, however, that the usury laws apply to the loan of money or other thing. And, in ascertaining whether the transaction be a loan, it is difficult to perceive any substantial distinction between the sale of a note by the maker for money, and a sale for currency, received and recognized as money. "When the cases say that an advance of money to the party offering his note for sale constitutes a loan, I think it is quite certain they mean, not only coined money and legal tender notes, but anything which passes current as the common medium of exchange, and measure of value for other articles, whether it be government issues or bank notes. Money is defined, by writers on commercial law, to be cash, that is, gold or silver, or the lawful circulating medium of a country, including bank notes when they are known and approved of, and used in the market as such. Burwell Law Dictionary; McCulloch Com. Dictionary, Title Money & Banks.
In Miller v. Race, 1 Burr. R. 452, 457, Lord Mansfield said, in reference to bank notes: “ They pass by a will which bequeaths all the testator’s money or cash. They are never considered as securities for money ; but as money itself They are not goods nor securities, nor covenants for debts; nor are they so esteemed ; but are treated as money, as cash, in the ordinary course and transaction of business, by the general consent of mankind, which gives them the credit and currency of money, to all intents and purposes.” See also Mann v. Mann’s Ex’or, 1 John. Ch. R. 231.
At the time of this transaction Confederate currency was the only money circulating in Virginia. It was exclusively used in the payment of taxes, State and Confederate, and in the purchase of property. Bor it the merchant sold his goods, the broker his gold, and the farmer the products of his farm. By the laws of the land, by general consent, and in a large majority *584 of the transactions of men, it became a circulating medium and a standard of value. For nearly four years it performed all the functions of money, and was 80 by the people, not only from motives of patriotic devotion to the cause in which they were engaged, but by the command of a government as potential in Virginia as that which now hears sway over the people. This view is sustained by the opinion of this court in Dearing’s Adm’x v. Rucker, 18 Gratt. Joynes, J., said it was undoubtedly tru e that the “ parties in that case, and the people generally, dealt with Confederate notes, to a certain extent, as money. They regarded their relation as that of debtor and creditor, and not that of buyer and seller.” In Thorington v. Smith, 8 Wall. U. S. R. 1, it was said by Chase, Ch. J., “ that Confederate notes were the only measure of value which the people had, and their use was a matter of absolute necessity.” It was argued that, as these notes were not convertible into gold, and were greatly depreciated, they cannot he treated as money. At an early period of the war, Confederate notes were at par, and readily converted into gold. According to the test suggested, they were at that period money, and so governed by the laws that regulate loans of gold and silver. In September, 1868, however, when at a depreciation of ten for one, they ceased to he money, and became a mere commodity. And the' transaction, which, in 1861, would have been a loan, must, if occurring in 1863, be treated as an exchange of securities or the sale of a commodity. And yet, in 1863, Confederate currency constituted the circulating medium of the State more generally than in 1861. True, the depreciation was greater in the latter period; but the only effect of such depreciation was an enhancement of prices: gold and all other commodities commanding higher nominal rates than in 1861.
The counsel for the appellee place much reliance *585 upon a remark made by Judge Rives in Boulware v. Newton, 18 Gratt. 708, to the effect that the transaction there was not to be treated as a loan, but as an engagement to pay for a commodity. Now, this remark, as applicable to that case, may have been, and no doubt was, correct. But I am sure Judge Rives did not mean to assert that every advance of Confederate money, upon the discount of a note, is to be regarded as the sale of a commodity; that proposition is not sustained by the decisions of this court. It is especially in conflict with the opinions expressed by all the judges in Dearing’s Adm’x v. Rucker. I have already quoted the views of Judge Joynes. Moncure, P., said: “ The lender had no idea of selling, nor the borrower' of buying, Confederate notes; but the transaction was purely one of a lending and borrowing of money, having reference to Confederate notes as a standard of value, and as a medium and measure of the loan; because, and only because, it was then the •only, or almost only, currency of the country.”
The same rule prevails in regard to a loan of Confederate notes as any other currency. Nor does it require argument or authority to show that the same rule prevails in regard to the loan of currency as the loan of coined money. Whether it be a bank note, or a Confederate issue, or stock advanced, once stamp the transaction with the impress of a loan, and the law denounces it as usurious if a greater value than the legal rate of interest be reserved. This proposition is sustained by the entire current of American authorities. See Bank of State of North Carolina v. Ford, 5 Ired. R. 692; Cleveland v. Lode, 7 Paige R. 557; Bondurant v. Commercial Bank Natchez, 8 Smedes & Marsh. R. 533, 544; Maury v. Ingraham, 28 Miss. R. 171; and the cases collected in a note to the 3d vol. Parsons on Contracts; State Bank of North Carolina v. Cowan, 8 Leigh, 238.
*586 Another view, urgently pressed upon our attention,, requires a somewhat extended notice. It was said that an anomalous and extraordinary state of affairs existed during the war; that gold was subject to sudden fluctuations; that it disappeared from circulation and ceased to be a standard of value, and should not be.applied as a standard to Confederate contracts. The scarcity of' the precious metals, and the fluctuations to which they were subject during the war, though unusual occurrences, are by no means without precedents in history. In 1797, the Bank of England suspended specie payments, and did not resume until 1822. Gold and silver disappeared from circulation; contracts were not made with reference to them, nor payments received in them; and during all that time, a period of immense operations in commerce and war, the entire business, and revenue of the country were carried on with the-aid of paper currency alone.
It is a fact familiar to all, that in 1836 the banks in this country suspended specie payments, and did not resume until 1842 and 1843; that gold and silver ceased to circulate as money, and the country was flooded with depreciated bank paper, producing unusual distress and embarrassment. In the State of Kentucky, at one period, the issues of the Bank of the Commonwealth constituted almost the entire circulating medium of the State, and gave rise to innumerable controversies for’ alleged violation of the usury laws. Illustrations might be drawn from the States of Mississippi and Illinois also, at certain periods of whose history the precious metals disappeared from the channels of circulation. In none of these instances has it been held, so far as L am informed, that gold and silver ceased to be the standard of value; that contracts then made were not to be tested by the rules of law applicable to contracts made in times more auspicious for the debtor class of' the community. Look at the Federal States during *587 the recent struggle. With all their vast wealth, credit and resources, their currency rose and fell with the rapidly-varying fortunes of the contest, until, at one ■ period, its depreciation was in the proportion of two dollars and ninety cents for one. This fact, alone, ineontestibly shows that gold, as a circulating medium, was withdrawn from the channels of trade and commerce, and was the subject of traffic and speculation, as other commodities.
With us of the south, after the disastrous campaigns of 1862, the depreciation was more rapid; but there was not a period during the war when the currency was not available in tlie purchase of gold, either from individuals or the government. We say that the Confederate treasury notes were depreciated. How depreciated? With reference to what standard? By what rule are we to ascertain the extent of the depreciation? Certainly not by other commodities. Provisions and the means of subsistence were scarce, difficult to be obtained, and commanding exorbitant prices. On the other hand, lands and slaves, thrown upon the market by the necessities of those who were forced into the armies or were chiven from their homes, were purchased without difficulty at extremely low rates. The price of commodities is not a safe or reliable standard. All must agree that gold was the standard of value during the earlier period of the war. When did it cease to be such? When did the usury laws cease to operate? What day, or month, or year, in that eventful history is to be designated, when it may be said that all contracts for the loan of money or currency, before such day, are to be controlled by the general rules of law; but if made thereafter, they shall be pronounced legal and valid, no matter how exorbitant the rate of interest reserved. The principle asserted will constrain us to proclaim a -suspension of the usury laws in regard to all contracts made during the war. The same rules *588 of construction must be applied to loans of bank paper, and even of gold and silver. For how can usury be predicated of any contract in communities having 110 standard of values? It was attempted to make Con'^e<^era^e n°tes a legal tender in the payment of debts; but the effort was unsuccessful, and the people of the State could not fail to understand that gold and silver were the only constitutional currency, and, as such, legally, the representative and standard of values.
This principle has been repeatedly recognized, both by the legislative and judicial departments of the State. The acts of 1865 and ’6 authorize the nominal amount of Confederate debts to be reduced to their true value; aud this court, in Dearing’s Adm’x v. Rucker, 18 Gratt., unanimously applied the gold standard in ascertaining the scale of depreciation. "Were this a Confederate contract, we should have no difficulty in applying the same standard, in order to fix a just measure of recovery. Are we precluded from so doing because the lender has imposed upon the borrower the hard alternative of paying the debt in United States currency ? Is the creditor to be heard, in one breath, to say there was no standard of value, no constitutional currency in existence during the war, to screen his contract from the arm of the law, and in the very next breath to claim that this contract was made with reference to that very standard, and that very currency he seeks to repudiate. It seems to me we must adopt the gold standard from sheer necessity. It is impossible to advance a step in construing contracts, settling controversies and rendering verdicts and judgments, without a resort to some standard. However scarce gold may have been, however fluctuating its value, it is the only safe and reliable standard for the adjustment of the contracts made during the war. Just or unjust, no other has been adopted by the courts.
*589 It lias been said there can be no usury unless the parties know all the facts which constitute the usury; and in this case it does not appear that they were in- • formed of the value of the Confederate notes when the transaction took place.
It is unnecessary to decide whether this proposition is law to the extent asserted. Concede that it is: is it to be presumed, is the idea to be for a moment entertained, that the common council, entering the market to buy or borrow $40,000 in Confederate currency, and that Sutherlin, having in his possession $20,000 in like currency to lend or sell, were not apprized of the value of the money or the commodity in which they were dealing. ~Were they alone ignorant of facts relating to this currency, well known to every person in Virginia possessed of ordinary intelligence ? Hot only the depreciation, but the extent of the depreciation, forced itself, daily and hourly, upon the observation of all men at that eventful period. It is a part of the public history of the country. How does it appear in any case that parties are informed of the market value of the article in which they traffic ? I have seen no decision which goes to the extent of holding that this fact is to be established by independent, affirmative evidence. It seems to me the courts have the right to in-, fer that parties dealing in depreciated paper, making it the subject of sale or loan, are aware of that depreciation. Any other inference would attribute to them the grossest ignorance of matters about which they are presumed to be informed, and tend to encourage usury, by adopting rules' calculated to screen it from judicial investigation.
It is said, however, there is no case where an obligation, given for a depreciated currency, in greater nominal amount than the obligation, has been adjudged usurious. The researches of the counsel have not produced a case in which it has been decided that such an *590 obligation for that reason is not usurious. What real difference is there, with reference to the question of usury, between the loan of $1,000 in notes, depreciated Per cent-> taking the obligation of the borrower for that sum, and the loan of a like amount in notes depreeja^e¿ 50 jper cent., taking the obligation of the borrower for $750, with interest. In the one case the lender contracts to receive $1,000 for $750 in value, and in the other $750 for $500 in value. In either case the lender unlawfully gains, and the borrower loses, the difference, by the terms of' the agreement. In Parker v. Ramsbottom, 5 Dowl. & Ryl. R. 138; 3 Barn. & Cres. R. 273, the defendants being indebted to the plaintiff for £18,000 in stock previously advanced, it was agreed between the parties that the defendants should be released from replacing the stock; and that, instead thereof, they should account for it in money, at the value of £10,000, paying six per cent, thereon. At the date of this agreement the market value of the stock was only £8,400. The court held that the statute evidently applies to loans of goods or anything that is called money’s worth, as well as loans of money itself; and, as the plaintiff was lending £18,000 in stock worth £8,400 only, and stipulating to be repaid £10,000, with legal interest on that larger sum, the contract was usurious. The authority of this case has never been questioned, so far as I am informed. In Judy’s Adm’r v. Gerard et al., 4 McLean R. 360, the defendant had executed his note for $500, in consideration of an advance of $1,000 in notes of the Bank of Illinois, worth only thirty-seven and a-half cents, as compared with gold. It was held that the contract was not usurious, not because, however, the nominal amount advanced was greater than the note, but for the reason that the transaction appeared to be a bona fide sale of the Illinois notes.
These cases show that, to bring a contract within the *591 ¡statute, it is only necessary it should be for the repayment of a greater value than the amount of the loan, with an advance thereon at the rate of six per cent.; ■and the result is not changed, in the slightest degree, by the fact that the nominal amount lent is a larger quantity than that of the obligation executed for its repayment.
It is also contended that the transaction is a contract of sale, in which Sutherlin was the vendor and the town of Danville the vendee of Confederate treasury notes as a mere commodity.
It is not denied that Confederate notes, besides being a currency, may have been the subject of sale under all the modifications that affect dealings in other articles ; but such cases were exceptional and not general. As was said in Dearing’s adm’x v. Rucker, the people generally dealt with Confederate notes as money, regarding their relation as that of debtor and creditor, and not that of buyer and seller. The opinion of the Supreme court of Kentucky in Warfield’s adm’rs v. Boswell, 2 Dana R. 224, though specially directed to the subject of depreciated bank paper, has a strong application to this question here. The Chief Justice said, “Although bank notes current as a circulating medium, like those of the Bank of Kentucky in 1822, are vendible, nevertheless they are more frequently the subject of loan than of sales on credit; and when they are actually sold on credit it is not reasonable to presume that the purchaser will agree to give double their value and interest also. We cannot doubt that when one man lets another have, as in this case, depreciated current bank notes of the value of $1,500, upon a promise to refund the nominal amount and legal interest in specie, nothing else appearing, the transaction should be deemed prima facie a loan. This would be the only probable or rational conclusion or deduction from the intrinsic character of such isolated *592 facts. A, desiring to use immediately $100 in bank notes worth only $50 in specie, applies to B for the notes. B delivers to him a bank note of the denominati°n of $100, worth only $50, and takes his note for in sPec^e; payable in oiie year, with legal interest ' from date, no other fact appearing. A affirms the transaction a loan, and B insists it was a sale. Can there be a reasonable doubt that loan is impressed on its face ? It has all the features of a loan, and if it should not be deemed a loan until the contrary be made to appear by proof aliunde, no transaction could ever be considered a loan unless the words borrowing and lending be expressly used in the contract.”
In the present case, Sutherlin did not propose to sell nor the town of Danville to purchase, Confederate notes. A sale of currency was not contemplated by either of the parties. The certificate was the subject of negotiation and sale, and the Confederate notes the medium of payment. Throughout the transaction the notes were treated as money. They were advanced on the one hand and received on the other under a statute authorizing the corporation of Danville to borrow mo.ney; and they were to be used as money in the immediate purchase of property. The special verdict finds, as fact, that the president of the common council was authorized to make-sale of the certificates; that the sale was made; that the certificate in question was sold to ¥m. T. Sutherlin, he being the highest bidder; that he paid therefor $11,050 in Confederate notes to ' the agent of the corporation. In the face of these plain facts, this court is asked to assume that Sutherlin, in bidding for the certificate, was in fact making sale of his Confederate notes. It is true, upon well settled principles of law, that the corporation of Dan-ville could not sell its own promise to pay. We are not, therefore, authorized to say that Sutherlin sold, or intended to sell, his currency without a fact found *593 by the jury, or even a scintilla of evidence in the record, warranting such a conclusion.
Again, it has been urged that this was a mere exchange of securities. The case of the Bank of United Staten v. Waggener, 9 Peters U. S. R. 378, was strongly relied on in support of this proposition. As this is the leading case cited, it may be proper to examine it with care and attention.
"Waggener executed his note to the Bank of the United States, at Lexington, for $5,000. The consideration of this note was an advance by the bank to Waggener, of the Bank of Kentucky notes, to the nominal, amount of $1,100, and a check upon the Bank of Kentucky for $3,900, which was paid in notes of like description. These notes were then depreciated 40 per cent. At the time of this transaction, the Bank of Kentucky was indebted to the United States Bank in the sum of $10,000, and was credited with the amount of the check just mentioned, and a short time thereafter paid the Bank of the United States the balance of the $10,000 in gold. The Supreme Court of the United States held the contract was not usurious. The decision was based upon the ground: 1st, there was no device to evade the statute; 2d, whether the transaction was a loan or exchange of securities, there was no usury, because the parties estimated their respective securities as of equivalent value, and the notes of the Bank of Kentucky, though depreciated in market, were of the full value of their numerical amount to the United States Bank, and were so treated by the borrower. The Bank of Kentucky was solvent and able to pay its debts, and the holders of its notes could have recovered the amount thereof, with interest in gold, from the.Bank of Kentucky. The plaintiffs could not, by the negotiation, entitle themselves to more interest than they were already entitled to against the Bank of Kentucky. The court, in commenting upon the in *594 struction asked for by defendant, say, it was objectionable because it put a bar to the plaintiff’s recovery, on the ground that depreciated bank notes were loaned at their nominal value, without reference to the fact whether there was a design to commit usury, or whether the notes were in reality of a higher intrinsic value to the parties; which were the turning points in the case.
If it appeared, in the case under consideration, that Sutherlin’s Confederate notes were of equal value with the certificate, and were so treated by the parties; that Sutherlin could not, by the negotiation, entitle himself to a higher interest than he was already entitled to against, the Confederate government; and that the amount of these notes might, by the use of due diligence, have been recovered in gold; the cases might be regarded as analogous, and brought under the influence of the same principies. But, in point of fact, the securities were not of equal value, and were not so considered by the parties. Two dollars and twenty-one cents of Confederate money were estimated as of equal value with one in gold, when the real value was in the proportion of ten for one. In other words, Sutherlin advances to the town of Danville $10,000 in currency, bearing no interest, worth $1,000 in gold, and takes the obligation of the town to repay $5,000 in gold or legal tender notes, with interest thereon from date, payable semi-annually. He therefore lent a thing of the value of $1,000 only, stipulating for a return of $5,000 with interest. Ho interest was due and payable upon the Confederate notes; nor could they, by the exercise of any sort of diligence, have been converted into gold at their full value, as they were only payable two years after the ratification of a treaty of peace.
All the cases in which the courts have held the transaction an exchange of credits or securities, show that the securities exchanged were bom fide estimated by the parties as of equal value, and the depreciated pa *595 per advanced as readily convertible into coined money. In the absence of these features, an advance of depreciated paper at its nominal value, to the party offering - his note for the same, is called a loan unless evidence is adduced to satisfy the mind that something else was intended. In the case already cited, the Supreme Court of the United States say, “If A and B mutually execute their obligations to each other for $ 100 with interest, usury cannot be predicated upon such a transaction. If, however, one note bore interest and the other ■did not, or if one charged a commission for the use of his note, such a transaction would be called a loan, and ■usurious, whatever the parties might term it.”
In Dry Dock Bank v. American Life Insurance Co., 3 Comst. R. 344, the court use this language: “ The company advanced their post notes, for these certificates are nothing else, as cash, at their nominal value, in the same manner that a bank of issue would receive and discount a note for a customer. In both cases there would be an exchange of promises. In each ease the property in the note issued would vest in the receiver. In neither case would any money be paid. But in both cases a substitute, by the understanding of the parties, Is advanced by the lender, and accepted as money by the borrower. Every transaction of the kind, when ■analysed, will be found to be a loan of money, whether designed or not, under the form of exchange.”
In Schermerhorn v. Talman, 14 New York R. 93, 117-18, Selden, Judge, said: “It maybe said, admitting a mere exchange of obligations not to be a sale, neither is it a loan, and hence it is entirely without the statute of usury, unless brought within it by extrinsic evidence that an evasion of the statute was intended. .It is true that, literally, the transaction is neither a •sale nor a loan, but an exchange. I apprehend, however, that, legally, in reference to the question of usury, it must be regarded as a loan or as a sale. Ho *596 other distinction has ever heen applied to such transactions by the courts.
In The State Bank of North Carolina v. Cowan, already cited no application was made for a loan, but an advanee of depreciated paper requested. It was claimed in the argument, that the transaction was a mere exchange of securities. But not a word fell from either of the judges that gave countenance or support to that proposition. The decision was based upon the ground that the funds in which Cowan’s note was payable, though at par when the contract was made, might be depreciated in market to the extent of the bank paper' loaned, by the time Cowan’s note arrived at maturity. It was also said, these notes of the bank, though then depreciated, were the representatives of so much coin, and Cowan might instantly, upon receiving them, have demanded the coin from the bank. But for these features, the contract would have been held a palpable violation of the usury laws.
It seems to me that this case is authority for the proposition that this contract cannot be sustained in Virginia, upon any pretence of an exchange of securities.
I can well understand that if two persons mutually execute their obligations to each other in like sums, such a transaction is ordinarily a mere exchange of credits. But it is difficult to understand how an advance of depreciated bank notes to a person executing or transferring his own obligation therefor, can be termed an exchange of securities. In the first place, according to the authority of Lord Mansfield, a bank note is not considered a security for any purpose. In the second place, as a man cannot sell his obligation, so neither can he exchange it. There is nothing in existence that can be the subject of exchange. A sale is a transmutation of property from one man to another for money. An exchange is a transferring of *597 'goods or property by way of barter. Chitty on Contracts page . But the obligation of a person in Ms own possession is not property nor a security. When delivered it becomes- simply a contract to pay, and nothing more. If it is not a contract to pay upon a ■sale, it must of necessity be a contract to pay upon a loan. A delivers to B his bond, and the latter delivers to A a chattel. The presumption is, that this is a sale of the chattel; because, ordinarily, a chattel is not the subject of a loan; and because the contract of A is to pay the price agreed on, and not to repay money loaned. This presumption will be rebutted by evidence shewing that a loan and an evasion of the statute were intended under color of a sale.
But if A delivers to B his bond, and the latter, in return, delivers a bank note circulating as money, the presumption is, that the transaction is a loan, because such currency is usually the subject of loan rather than sale. It is true the agreement is not to repay the bank note or notes of like kind. It is, however, a contract to repay the money of which the bank note is the representative. This presumption of a loan may also be rebutted by evidence shewing that the bank note was Iona fide the subject of purchase and sale. If, however, the bond is the subject of negotiation and sale, then the transaction is a loan, for the reason, as I have heretofore endeavored to shew, that a party cannot sell Ms own obligation or promise to pay. The distinction between a purchase of such an obligation and that of a third person, is founded upon the soundest principles of law. In the latter instance a subsisting debt is the subject of negotiation and sale, and the obligation is merely the evidence of the debt. Where, however, the party sells his own promise or obligation there is no debt in existence which can be the subject ■of sale. In such case the purchase of the obligation *598 is simply an advance of money upon the security of tiie parties to the instrument. The transaction in law is a borrowing and lending, and nothing else. This. principle is recognized by all the authorities, bio solid reason'tias ever been assigned why the same rule is not ‘ applicable toan advance of currency constituting a circulating medium, and performing all the functions of money. . With what reason can it be said that if a note is-discounted for the maker, at par or below par in gold, it is a loan; if it is discounted 25 per cent below par in legal tender notes it is a loan; but if bank notes or other depreciated currency he given for it, the transaction is not a loan, but a sale or exchange of securities? In either case, the object of one party is to lend; that of the other to borrow money or its equivalent.- In the one case there is a loan of money; in the other a loan of currency—the substitute for money—so recognized and treated by the parties; and as such, the transaction is directly within the statute which applies to-the loan of money or other thing. In the absence of' evidence tending'to impress upon the contract a different character, it seems to me, it is to be presumed, that an advance of a depreciated currency to the party executing therefor his own obligation, is a loan. This, presumption,' according to many of the adjudicated cases, is materially strengthened by the reservation of interest payable from the date of the contract. It is. very justly said that different persons estimate paper-money very differently; that one person, supposing it might be equal to specie on a particular day, might be-willing to purchase it for his own note, payable at that period; but that a party purchasing upon such a contingency would scarcely contract for the payment of interest in the meantime; and that such a reservation is a strong indication of a loan, and, unexplained,, should be conclusive.
*599 In Moore’s ex’or v. Vance, 3 Dana’s R. 361, Judge Marshall, delivering the opinion of the Supreme court of Kentucky, said: “If there was any doubt that the transfer of the executions was intended as a loan, the fact that the party was to pay interest upon their nominal amount from the date, which would he considered as conclusive if the hank notes themselves had been transferred, must also he taken as conclusive as to the transfer of the executions.
The present transaction, tested by these rules, must he considered a loan; and as, by the terms of the agreement, a greater value is reserved than legal interest, it must he held to he a usurious loan.
In conclusion, it is proper to state there is nothing in the record tending to show any corrupt motive or intention on the part of the plaintiff. I have no doubt the contract was made without a thought on his part of violating the statute against usury. It is well settled, however, that if the lender intends to take more than legal rate of interest, the law will infer the corrupt motive, however innocent the parties may he of any design to violate the law.
In Marsh v. Martindale, 3 Bos. & Pull. R. 154, Lord Alvanley said: “Though the jury have found that Sir Charles Marsh did not think he was acting contrary to law, there is nothing in that finding to prevent us from examining the transaction and declaring it to he corrupt, if it appear to us to he so in point of law, without sending the case hack to a jury to find the corrupt intent. It is needless to multiply the authorities upon this point, as the law is too Well settled to be called in question at this day. The principle pervading the decisions, almost without exception, show that the facts being agreed by the parties, or found by the jury, or arising upon a demurrer to the evidence, the inference *600 of the law as to the intention of the parties and' the character of the contract devolves on the court.”
Christain, J., concurred in the opinion of Staples, J.
,, _ Moncure, P., dissented.
Judgment reversed.